Joseph G. **HIRSCH** and Ruth Shuman, Co-Partners d/b/a Rutledge Manufacturing Company,

v.

**UPPER SOUTH DEPARTMENT OF THE INTERNATIONAL LADIES' GARMENT WORKERS' UNION, AFL–CIO.**

No. 10954.

United States District Court
D. Maryland.
Civil Division.
Oct. 24, 1958.

Eli Baer, Baltimore, Md., for plaintiffs.

Jacob J. Edelman, Marshall A. Levin, Baltimore, Md., for the Union.

CHESNUT, District Judge.

The complaint in this case seeks an injunction to stop arbitration proceedings demanded by the defendant under the provisions of a labor contract between an employer and the defendant Union. While the basis for the jurisdiction of this court is not expressly stated in the complaint, from the subject matter it seems to be based on section 301 of the Labor Management Relations Act of 1947 (Taft-Hartley Act) 29 U.S. C.A. § 185; see Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972.[1]

The plaintiffs are partners resident in New York State engaged in the business of manufacturing principally pajamas, under the name of Rutledge Manufacturing Company, with plant in Baltimore, Maryland. The defendant is

1. In view of the disposition of the case hereafter made, I think it unnecessary to more fully explore the question of the jurisdictional basis. The defendant makes some contention that injunction is not a proper remedy in this case by reason of the much earlier Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq.

an unincorporated national labor union having its regional office for Maryland and nearby territory, in Baltimore City. The divisional manager is Mrs. Angela Bambace. It represents all the production workers in the plaintiffs' Baltimore plant.

On April 23, 1958 the defendant Union gave notice to the employer of a desire to re-negotiate the wage rate stated in the contract, and when the employer declined to accede thereto, the Union demanded arbitration of the dispute. The employer contends that under the contract, and particularly a written supplement thereto, the matter is not arbitrable. The precise matter in controversy requires the construction and application of the proper meaning and effect of a phrase in section 3 of the supplement to the contract. This necessitates a careful reading of the whole contract, particularly the supplement thereto.

The contract was dated April 26, 1956 and was to be in force between the parties until October 20, 1959. It is a lengthy document of 15 typewritten pages. It consists of 23 Articles containing many detailed provisions with respect to rate of wages per hour, broad provisions for arbitration of any and all disputes with prohibition of strikes and lock-outs and court action, federal and state, and increase or decrease in rate of wages dependent upon the rise or fall of the cost of living or changes in the devaluation or evaluation of the dollar. The more important provisions of the contract (other than the supplement thereto above mentioned) are these:

The hourly rate of minimum wage for time workers was fixed at $1, and for piece workers at $1.05. Art. 20 provided for re-negotiation of wage rates either as to increase or decrease dependent upon the rise or fall of the cost of living.[2] Art. 23 provided that there should be no revaluation of the wage rate prior to April 20, 1958. The Union's request for re-negotiation of the wage rate was made by letter to the employer dated April 23, 1958.

The plaintiffs' contention is that by reason of the supplement [3] to the contract the wage rates provided for in the contract were "frozen" during the life of the contract, that is until October 20, 1959, thus in effect overriding the provision in art. 20 of the contract. The supplement to the contract dated May

2. The text of art. 20 of the contract is:
"Article XX: Change in Cost of Living
"Should there be a rise or drop in the cost of living or a devaluation or evaluation of the dollar, the parties will meet for the purpose of considering an increase or decrease in wages commensurate therewith. Should the parties for any reason fail to reach an agreement upon such increase or decrease, then such disagreement shall be treated as a dispute under this agreement and adjudged as any other dispute, through the machinery for adjustment of disputes, as provided in this agreement."

3. "Supplement      May 2, 1956
"It is hereby agreed between the parties hereto that:
"1. The $1.05 wage adjustment pertaining to piece workers and time workers shall go into effect on Monday, May 14, 1956.
"2. The one (1%) per cent Retirement Fund provision shall go into effect October 20, 1956.

"3. During the life of this agreement the Employer and the Union agree to try to maintain the present wage standards in the plant.
"Both Union and Management shall make every effort to maintain or increase the earnings of all employees by development of better methods and the use of modern equipment. It is expressly understood that each employee will give his or her full cooperation to bring about an increase in his or her earnings by applying their maximum skill and speed. Management will do their best to assist every employee to increase their earnings on piece work in every way possible.
"4. If the parties cannot agree on an arbitrator within five (5) days, then upon request of either party the American Arbitration Association shall designate the arbitrator and the arbitration shall be conducted in accordance with its rules."

2, 1956, contains in the first sentence of section 3 the following language:

"During the life of this agreement the employer and the Union agree to try to maintain the present wage standards in the plant." The parties are in irreconcilable conflict as to the meaning and effect of this provision of the contract as a whole. And under the testimony of the parties respectively it is not possible to reconcile as to how and when and by whom this sentence was included in the supplement, and the respective understandings thereof by the parties are in insoluble conflict on their testimony. The plaintiffs contend that not only the whole of the original contract but also the whole of the supplement was prepared by the defendant Union and sent to the employer who at once signed the original contract dated April 26, 1956, and returned it promptly to the Union for its signature; and that thereafter on or about May 3, 1956 Mr. Hirsch, plaintiff employer, to his surprise received the supplement. Not understanding its import and particularly the quoted sentence therein, he telephoned Mrs. Bambace to inquire the meaning of the provision. He said that as a result of a conversation of an hour or more he was told by her that the purport of the sentence was in effect to "hold the line" or in other words "freeze" the wage rate for the life of the contract. On this understanding he accepted the supplement, signed it and returned it to the Union. He was willing to do so because under the original contract as worded, the employer was entitled to a lowering of the wage rate if the cost of living declined, and it had been his contention for a long time that the wage rate was too high for his competitive position in manufacturing; and as he did not anticipate a rise in the cost of living under then prevailing economic conditions, he was willing to give up the opportunity for a decrease in wages on the condition that there should be no increase therein during the life of the contract.

Contrary to this, the defendant's testimony given by Mrs. Bambace and cor-roborated in part at least by her assistant, Mrs. Murray, and by their secretary, Miss Frank, was that the supplement to the contract was agreed upon and formulated in the office of the Union on May 2, 1956 in the presence of herself, Mrs. Murray, Miss Frank and Mr. Freiberger, the Baltimore plant manager for the employer, and that the disputed sentence was proposed by Mr. Freiberger and accepted by Mrs. Bambace for the Union as a result of a protracted argumentative discussion about the contract. More particularly it was stated by these witnesses for the Union that the original contract as first prepared was not accepted at once by the employer but returned to the Union for changes therein and that in consequence there ensued the meeting with Mr. Freiberger, and as a result of the discussion with him the last two pages of the original contract were re-written by Miss Frank and the supplement was also written at the same time and annexed to the contract. Mr. Freiberger categorically denied that he was present when the supplement was prepared and written, or that he had had any part whatever in formulating it. Mrs. Bambace explicitly denied that she had had the telephone conversation with Mr. Hirsch as related by him, and denied that she had made at any time any statement to him to the effect that the wages would by section 3 of the supplement be "frozen" during the contract. She also categorically denied a statement made by Mr. Hirsch with regard to other things said by her of similar import. An inspection of the last three pages of the contract, including the supplement thereto, with the former pages, seem to indicate that the latter by comparison of the vertical marginal lines and the typewriting had been separately typed, thus to some extent corroborating the testimony of the defendant as to the time of writing and annexing the supplement to the original contract.

█ Counsel for the defendant objected to the admissibility of Mr. Hirsch's conversation with Mrs. Bambace as to the meaning and effect of the supplement

on the ground that it was an attempt by parol to vary, modify or contradict the written words in the supplement, and moved to strike out this parol evidence. After hearing the extended testimony of the several witnesses in the case, I have concluded that this motion to strike should be and it is hereby *granted*. The intrinsic nature of the subject matter and the evidence with respect to the proper interpretation of the wording of the supplement shows the importance of limiting it to the wording of the contract as written. In an agreement of this kind it is evident that the written contract must be regarded in most instances, and in this one, as an *integration* of other prior discussions and that it would be dangerous to base their interpretation on conflicting parol testimony for the construction and application of the written word. And in the instant case after careful consideration of the whole of the testimony I doubt very much whether either or both of the parties had any very clear and definite understanding of the precise import of the particular sentence. And if, as I think must be the case here, the construction is limited to what appears in writing, I do not find the phrase "try to maintain the present wage standards" sufficiently clear to override the very much clearer and fully expressed provision of art. 20 of the original contract providing for re-adjustment of the wage rate dependent upon the increase or decrease in the cost of living.

Argumentative attention is also called by the defendant to the fact that in a prior contract of a similar nature between the same parties made in 1952, there was a stipulation in art. 18 that during the period of that agreement the rate of wages should not be subject to change by arbitration. In this connection it is pointed out that the present contract made in 1956 carried no similar provision against arbitration, and that it is inferable that the phrase in the supplement "try to maintain the present wage standards" was suggested by Mr. Frieberger as a partial substitution in the contract of 1956 for the stipulation against arbitration of wage standards contained in the 1952 contract. But even if so, the expression is certainly not clear enough to carry the import of overriding the express provision of the 1956 contract for the adjustment of wage rates dependent upon the cost of living.

Moreover, it is to be importantly noted that the second paragraph of section 3 of the supplement reads:

"Both Union and Management shall make every effort to maintain or increase the earnings of all employees by development of better methods and the use of modern equipment. It is expressly understood that each employee will give his or her full cooperation to bring about an increase in his or her earnings by applying their maximum skill and speed. Management will do their best to assist every employee to increase their earnings on piece work in every way possible." It seems to imply that the effort to *"maintain* the present wage standard" was to be by the means therein mentioned, and thereby to negative the plaintiffs' contention that the effect of "try to maintain" was to "freeze" the wage rate.

But however these latter considerations may be, I think the proper basis for determination of the controversy here is to apply the well-known rule that in civil actions the burden of proof is on the plaintiff to establish his case by a preponderance of the evidence. In the instant case I find the plaintiff has failed to do this and therefore I have concluded that the complaint (which I understand is now submitted for final disposition on the evidence) must be and hereby is *dismissed*, with costs, as the defendant has also filed a motion to dismiss the complaint.